**CENTURY 21 REAL ESTATE
LLC, Plaintiff,**

v.

**BERCOSA CORP. and Pedro
Bernard, Defendants.**

No. 08–CV–3175 (JG)(JO).

United States District Court,
E.D. New York.

Sept. 18, 2009.

Matthew Joseph Koster, Ronald A. Giller, Gordon & Rees, LLP, New York, NY, for Plaintiff.

## ORDER

JOHN GLEESON, District Judge.

On October 31, 2008, the Clerk of the Court entered default as to defendants Bercosa Corp. and Pedro Bernard and I referred the motion for a default judgment to Judge James Orenstein for a Report and Recommendation ("R & R") on the question of appropriate relief. On November 18, 2008, plaintiff Century 21 Real Estate LLC ("Century 21") filed a motion for entry of default judgment including both permanent and injunctive relief and monetary damages against Bercosa and Bernard. On August 25, 2009, Judge Orenstein filed his R & R as to the plaintiff's motion.

Both because the defendants have failed to object to the R & R and because I agree with Judge Orenstein's thorough, careful and well-reasoned analysis, I adopt the recommendations in the R & R. Accordingly, the Clerk of the Court is hereby directed to enter judgment as follows: default judgment in favor of plaintiff Century 21 and award Century 21 a total of $319,832.32 jointly and severally against defendants Bercosa and Bernard, consisting of $309,585.32 for the defendants' contract claims (including $58,781.24 in outstanding contractual payments, $9,894.57 in contractual interest on such payments, and $240,909.51 in liquidated damages), $5,000.00 in statutory damages under the Lanham Act, $4,582.00 in attorneys' fees, and $665.00 in other costs. Further, the judgment shall include injunctive relief ordering the defendants to cooperate in an audit of defendant Bercosa's books and records, and both defendants are also permanently enjoined from using the Century 21 Marks to market or promote their real estate brokerage services and from otherwise holding themselves out as a Century 21 franchise.

So Ordered.

## REPORT AND RECOMMENDATION

JAMES ORENSTEIN, United States Magistrate Judge.

In a Complaint filed on August 5, 2008, plaintiff Century 21 Real Estate LLC ("Century 21") accused defendants Bercosa Corp. ("Bercosa") and its owner Pedro Bernard ("Bernard") of breaching a contract and of making unauthorized use of

Century 21's trademarks in violation of the Lanham Act, 15 U.S.C. § 1051 *et seq.* Docket Entry ("DE") 1 ("Complaint"). The defendants have never responded to the Complaint. On October 30, 2008, at Century 21's request, DE 4, the Clerk noted the defendants' default. Century 21 now seeks a default judgment, DE 6 ("Motion"), and the Honorable John Gleeson, United States District Judge, has referred the matter to me for a report and recommendation. I now make my report and, for the reasons set forth below, respectfully recommend that the court award Century 21 a total of $319,832.32, consisting of $309,585.32 on its contract claims (including $58,781.24 in outstanding contractual payments, $9,894.57 in contractual interest on such payments, and $240,909.51 in liquidated damages), $5,000.00 in statutory damages under the Lanham Act, $4,582.00 in attorneys' fees, and $665.00 in other costs. I further recommend that the court order the defendants to cooperate in an audit of Bercosa's books and records, and that it permanently enjoin both defendants from using the Century 21 Marks to market or promote their real estate brokerage services and from otherwise holding themselves out as a Century 21 franchise.

## I. *Background*

The following factual recitation is drawn from the Complaint's uncontested allegations. Century 21 operates a franchise system that offers real estate brokerage services throughout the country. It provides promotion, resources, and other types of support to its franchisees, and permits them to use its trademarks, service marks, and logos (collectively, the "Century 21 Marks") in order to clearly identify the origin of their services. Complaint ¶¶ 7–16; *see also* Motion Ex. 3 (Declaration of Jacqueline Bertet, Century 21's Senior Director of Financial Services) ("Bertet Dec.") ¶¶ 4–13. The Century 21 Marks are registered with the United States Patent and Trademark Office and Century 21 retains the exclusive right to use and license them. Complaint ¶¶ 8–9; *see also* Bertet Dec. ¶¶ 5–6. Century 21 has expended substantial time, effort, and money developing goodwill in its marks and endeavoring to cause consumers to associate them exclusively with Century 21 services. Complaint ¶¶ 10–16; *see also* Bertet Dec. ¶¶ 7–13.

On November 1, 2005, Century 21 executed two separate franchise agreements with Bercosa, pursuant to which Bercosa agreed to operate two Century 21 franchises in New York—one in Brooklyn and one in Queens—for a period of ten years beginning January 2, 2006. Complaint ¶¶ 17–20 & Exs. 2, 3 (franchise agreements) ("Agreement") ¶¶ 1.7, 2.4.[1] The agreements required Bercosa to make certain monthly payments to Century 21 (including "royalty fees" and contributions to Century 21's National Advertizing Fund), and to keep records and reports of its transactions. Agreement ¶¶ 7, 8, 13. Century 21 retained the right to terminate the agreements if Bercosa failed to satisfy any of its contractual obligations. *Id.* ¶ 16. In the event that Century 21 exercised that right, Bercosa would be required to stop using the Century 21 Marks and to discontinue all advertising as a Century 21 franchise. *Id.* ¶ 16.4. It would also be obligated to permit Century 21 to perform an audit of the business. Complaint ¶ 43; Agreement ¶¶ 13.2, 16.9. In connection with the franchise agreements, Bernard executed a personal guarantee of Bercosa's obligations under the agreements. *See*

---

**1.** The two contracts at issue are substantively identical except with respect to the location of the franchise. I will use "Agreement" to refer collectively to both and will use a single citation to refer to identical provisions that appear in each contract.

Motion Ex. 1–C (Guarantee of Payment and Performance) ("Personal Guarantee").

When Century 21 audited Bercosa's records in early 2007, it discovered that Bercosa had failed to report certain transactions and to pay certain fees. Bertet Dec. ¶¶ 17, 34–37; *see also* Complaint ¶¶ 77, 83. On September 4, 2007, Century 21 wrote to Bernard notifying him that Bercosa had materially breached the franchise agreements and announcing its intention to terminate both agreements if the breach was not cured by October 10, 2007. Complaint ¶ 35 & Ex. 5 (letters dated Sept. 4, 2007). Bercosa failed to cure its breach. Complaint ¶ 36; Bertet Dec. ¶ 26. On October 29, 2007, Century 21 send Bernard notice that it was terminating the agreements effective October 30, 2007. Complaint ¶ 37 & Ex. 6 (letters dated Oct. 29, 2007). The letters also demanded that the defendants immediately stop using the Century 21 Marks. Bertet Dec. ¶ 27; Complaint Ex. 6. The defendants nevertheless continued to use the Century 21 Marks. Complaint ¶¶ 40–41; Bertet Dec. ¶ 30. In February and April of 2008, Century 21 had its attorneys send the defendants further letters demanding that they immediately stop using the Century 21 Marks and pay all outstanding fees and warning of the possibility that Century 21 would take action to enforce its rights, including its rights under the Personal Guarantee. Complaint ¶¶ 41 & Ex. 7 (letters dated February 25, 2008 and April 29, 2008). The defendants neither responded nor complied with Century 21's demands. Complaint ¶¶ 41–43. The defendants continued to use the Century 21 Marks through the date that Century 21 initiated this lawsuit. Bertet Dec. ¶ 30.

Century 21 asserts claims under both state and federal law. Specifically, it asserts claims under the Lanham Act based on the defendants' continued use of the Century 21 Marks after the franchise's termination. *See* Complaint ¶¶ 44–53, 54–58, 59–66 (Lanham Act claims); 15 U.S.C. § 1114 (Lanham Act Section 32(a), prohibiting trademark infringement); *id.* § 1125(a) (Lanham Act Section 43(a), prohibiting false designation of origin); *id.* § 1125(c) (Lanham Act Section 43(c) prohibiting trademark dilution). It also asserts several state law contract claims based on the defendants' failure to satisfy various obligations under the franchise agreements. Complaint ¶¶ 67–73, 74–79, 80–85, 86–89, 90–93, 94–97.

In its request for relief, Century 21 seeks a total monetary award of $480,727.96. Specifically, Century 21 asks for $100,000 in statutory damages under the Lanham Act, as well as $372,530.60 in damages on the contract claims—consisting of $68,162.34 in fees owed under the terms of the franchise agreements, $11,529.82 in interest, and $292,838.44 in liquidated damages. Century 21 also seeks $8,197.36 in attorneys' fees and costs, an injunction prohibiting the defendants from using the Century 21 Marks, and an audit of Bercosa's books and records. Bertet Dec. ¶ 59; DE 6 Ex. 1 (memorandum of law) ("Memo.") at 17.

## II. *Discussion*

### A. *Liability*

When a defendant defaults, the court must accept as true all well-pleaded allegations in the complaint, except those pertaining to the amount of damages. Fed.R.Civ.P. 8(b)(6); *see Finkel v. Whiffen Electric Co.*, 577 F.3d 79, 83 n. 6 (2009) (citing *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir.1992)). The fact that a complaint stands unanswered does not, however, suffice to establish liability on its claims: a default does not establish conclusory allegations, nor does it excuse any defects in the plaintiff's pleading. With respect to

liability, a defendant's default does no more than concede the complaint's factual allegations; it remains the plaintiff's burden to establish that those uncontroverted allegations, without more, establish the defendant's liability on each asserted cause of action. *See, e.g., id.* at 84–85; *DIRECTV, Inc. v. Neznak,* 371 F.Supp.2d 130, 132–33 (D.Conn.2005) (denying default judgment on several claims based only on conclusory allegations which lacked a sufficient factual basis for a finding of liability); *see also Trans World Airlines, Inc. v. Hughes,* 449 F.2d 51, 69 (2d Cir.1971) (default-based liability is established by "well-pleaded allegations in a complaint"), *rev'd on other grounds,* 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973); *Greyhound Exhibitgroup,* 973 F.2d at 159 (complaint's assertion of proximate cause necessary for finding of liability must be "properly alleged"); *Levesque v. Kelly Communications, Inc.,* 1993 WL 22113, at *5 (S.D.N.Y. Jan. 25, 1993) ("the Court must be satisfied initially that the allegations of the complaint are 'well-pleaded'") (citing *Hughes,* 449 F.2d at 63). Accordingly, before considering the issue of damages as to each cause of action, I first examine whether the Complaint successfully states a claim for relief.

### 1. *Lanham Act Claims*

Century 21 asserts three claims under the Lanham Act: trademark infringement in violation of 15 U.S.C. § 1114, false designation of origin in violation of 15 U.S.C. § 1125(a), and trademark dilution in violation of 15 U.S.C. § 1125(c). Trademark infringement is the use without consent of "any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive[.]" 15 U.S.C. § 1114(1)(a). A claim of false designation of origin, or "trade dress infringement," requires the use of "any word, term, name, symbol, or device, or any combination thereof" which "in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of ... goods, services, or commercial activities[.]" 15 U.S.C. § 1125(a)(1). The Lanham Act's trademark dilution provision prohibits the use "of a mark or trade name in commerce that is likely to cause dilution by blurring ... of the famous mark." 15 U.S.C. § 1125(c).[2]

#### a. Bercosa

■ Century 21 can prevail on both of its first two Lanham Act claims against Bercosa—trademark infringement and false designation—by showing that it owns a valid trademark, that Bercosa used the trademark in commerce, and that Bercosa's use of that mark is likely to cause confusion regarding the source of the relevant product or services. *Johnson & Johnson Consumer Companies, Inc. v. Aini,* 540 F.Supp.2d 374, 388 (E.D.N.Y. 2008); *see also Louis Vuitton Malletier v. Dooney & Bourke, Inc.,* 454 F.3d 108, 114 (2d Cir.2006) (noting that the same analysis applies to claims under 15 U.S.C. §§ 1114 and 1125(a)); *GMA Accessories, Inc. v. Croscill, Inc.,* 2008 WL 591803, at *3 n. 2 (S.D.N.Y. Mar. 3, 2008) ("The legal standards governing § 1114(1)(a) and § 1125(a) claims are identical."); *Cartier v. Samo's Sons, Inc.,* 2005 WL 2560382, at *3 n. 3 (S.D.N.Y. Oct. 11, 2005) ("The elements of trademark infringement, pursuant to [§ 1114] are the same as trade dress infringement, pursuant to [§ 1125(a) ]; in

---

**2.** 15 U.S.C. § 1125(c) prohibits the use of a mark in a way that is likely to cause both "dilution by blurring" and "dilution by tarnishment." 15 U.S.C. § 1125(c). Century 21 has pleaded only that dilution by blurring occurred. Complaint ¶¶ 59–66.

the case of trademark infringement, the mark in question must be registered.") (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 155 (2d Cir.2002)).

■ Courts evaluate the latter element—likelihood of confusion—by considering the eight "*Polaroid* factors." *See Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir.1961). Those factors are: (1) strength of the plaintiff's mark; (2) the degree of similarity between the two marks; (3) the proximity of the products in the marketplace; (4) the likelihood that the plaintiff will bridge the gap between the products (enter a market related to that in which the defendant sells its product); (5) evidence of actual confusion; (6) the defendant's bad faith; (7) quality of the defendant's product; and (8) sophistication of the relevant consumer group. *Id.; Louis Vuitton Malletier*, 454 F.3d at 116–117. No single factor is dispositive—the court's task is to weigh them with an eye toward the ultimate question of whether consumers are likely to be confused. *Brennan's Inc. v. Brennan's Rest.*, 360 F.3d 125, 130 (2d Cir.2004).

Applying the relevant law to the circumstances of this case, I conclude that Century 21's Complaint and the defendants' default together suffice to establish Lanham Act claims under both Section 1114 and Section 1125(a). First, Century 21 has alleged that its marks are on the principal register of the United States Patent and Trademark Office, and has provided documentary proof of those registrations. Complaint ¶ 8; Motion Ex. 4. Second, Century 21 has clearly demonstrated Bercosa's unauthorized use of the Century 21 Marks after the date of the termination of the franchise agreements. *See* Complaint ¶¶ 38–41; Bertet Dec. ¶¶ 30–31. Finally, as discussed below, the *Polaroid* factors weigh heavily in Century 21's favor, compelling the conclusion that consumers are likely to be confused by Bercosa's use of the Century 21 Marks.

As to the first *Polaroid* factor, the Century 21 Marks are presumed to be strong by virtue of being registered. *See Rolex Watch U.S.A., Inc. v. Jones*, 2000 WL 1528263, at *2 (S.D.N.Y. Oct. 13, 2000) (citing *Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 393 n. 6 (2d Cir.1995)). Moreover, Century 21 has devoted substantial time and resources to developing goodwill in its Marks and to causing consumers to associate them exclusively with Century 21's real estate brokerage services. Complaint ¶ 14; Bertet Dec. ¶ 11. As to similarity, the marks at issue are identical—the defendants have simply failed to stop using the actual Century 21 Marks despite termination of their franchise. The marketplace factors also favor Century 21: the parties offer the same basic product (real estate brokerage services) and Bercosa continues to operate out of the same location it occupied as a Century 21 franchisee. Complaint ¶ 40–41. Finally, the defendants' bad faith is manifest: the franchise agreements explicitly prohibit Bercosa from using the Century 21 Marks or otherwise holding itself out as a Century 21 franchisee once the agreements are terminated, and Bercosa's apparent refusal to adhere to those terms suggests an intent to capitalize unfairly on Century 21's reputation.

In short, consumers are likely to assume that Bercosa continues to operate as a Century 21 franchise at its two locations, yet Century 21 can no longer control the quality of services the defendants are providing. Century 21 has thus made the showing necessary to prevail on a claim for a violation of either Section 1114 or Section 1125(a), and I therefore respectfully recommend that the court find Bercosa liable on these two causes of action.

The Complaint is likewise sufficient in asserting that the defendants have violated

Section 1125(c) by undermining the distinctive quality of Century 21's Marks. *See* Complaint ¶¶ 59–66. The statute entitles the owner of a distinctive famous mark, subject to the principles of equity, to an injunction against anyone who uses the mark in a way that is likely to cause "dilution by blurring" of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury. 15 U.S.C. § 1125(c)(1). Whether a mark or trade name is likely to cause dilution by blurring depends on factors including the similarity between the mark and the famous mark, the distinctiveness and degree of recognition of the famous mark, and whether the user of the mark or trade name intended to create an association with the famous mark. 15 U.S.C. § 1125(c)(2)(B). Here, the defendants used marks identical to Century 21's distinctive and highly recognizable Marks and, by doing so, clearly intended to create an association with Century 21's Marks. I therefore respectfully recommend that the court find Bercosa liable on the trade dilution claim.

### b. *Bernard*

■ A company's individual officer can be held personally liable under the Lanham Act if the officer is a "moving, active conscious force" behind the corporation's infringement. *Johnson & Johnson,* 540 F.Supp.2d at 393 (quoting *Bambu Sales, Inc. v. Sultana Crackers,* 683 F.Supp. 899, 913 (E.D.N.Y.1988)); *Kuklachev v. Gelfman,* 2009 WL 804095, at *5 (E.D.N.Y. Mar. 25, 2009); *ABC Rug & Carpet Cleaning Service, Inc. v. ABC Rug Cleaners, Inc.,* 2009 WL 773256, at *1, 3 (S.D.N.Y. Mar. 23, 2009). An officer's "authoriz[ation] and approv[al][of] the acts of unfair competition which are the basis of the corporation's liability is sufficient participation in the wrongful acts" to make the officer individually liable. *Bambu Sales,* 683 F.Supp. at 913 (internal punctuation

and quotation marks omitted); *see also Cartier v. Samo's Sons, Inc.,* 2005 WL 2560382, at *10 (finding individual defendant officer personally liable on trademark infringement claims on the basis of his responsibility for making purchasing decisions).

■ Century 21's well-pleaded allegations and supporting evidence suffice to establish Bernard's personal liability under the Lanham Act. It is apparent from the pleadings that Bernard was a "moving, active conscious force behind" Bercosa's infringement. *Bambu Sales,* 683 F.Supp. at 913. Century 21 alleges that Bernard is the "owner and an officer of Bercosa and is the moving, active and conscious force behinds [sic] its misconduct alleged herein and as an officer of the company authorized and approved this misconduct." Complaint ¶ 3. The record amply supports those allegations. Bernard is the sole owner and officer of Bercosa, Bertet Decl. ¶ 23, and is listed in the franchise agreements as the "Responsible Broker," responsible for supervising the affairs of the franchise operations and for assuring compliance with all terms of the agreements. Agreement ¶¶ 2.3, 10.1.3. Pursuant to the franchise agreements, Bernard agreed to personally "engage in the management and/or supervision of the Franchise operation." Agreement ¶ 10.1.3. That Century 21 specifically directed each of its letters regarding termination of the franchise and the defendants' attendant obligations to Bernard is further evidence that Bernard had a direct hand in the acts of infringement at issue here. Complaint Ex. 5, 6, 7. I therefore respectfully recommend that the court find Bernard personally liable for Bercosa's Lanham Act violations.

### 2. *Contract Claims*

■ I review Century 21's contract claims under the substantive law of New Jersey. *See* Agreement ¶ 22.7 (choice-of-

law provision); *Rogers v. Grimaldi*, 875 F.2d 994, 1002 (2d Cir.1989) (a federal court "adjudicating state law claims that are pendent to a federal claim must apply the choice of law rules of the forum state"); *Schiavone Constr. Co. v. City of New York*, 99 F.3d 546, 548 (2d Cir.1996) (New York law requires court to honor a contractual choice-of-law provision). Although New Jersey has a detailed statutory scheme governing franchise relationships, that regime does not apply where, as here, the franchisee is located outside of New Jersey. *See New Jersey Franchise Practices Act*, N.J. Stat. § 56:10–4. I therefore analyze Century 21's contract claims under general contract law principles of New Jersey law, which require proof of "(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that [the plaintiff] performed its own contractual obligations." *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir.2007); *see also Hanson Engineering, Inc. v. Ascher*, 2008 WL 1782392, at *2 (D.N.J. Apr. 16, 2008).

■ Century 21 has adequately pleaded, and by virtue of the default proved, each of these elements as against Bercosa. It entered into two franchise agreements with Bercosa under which Bercosa agreed to operate Century 21 franchises in Brooklyn and Queens from January 2, 2006 to January 1, 2016. Complaint ¶¶ 17–18; Agreement ¶¶ 1.5, 1.7. Bercosa breached those agreements by failing to report certain transactions and by failing to make certain payments required under the agreements. Complaint ¶¶ 21–22, 26, 34, 77, 83. Century 21 was damaged by Bercosa's failure to report transactions and pay the agreed-upon fees on those transactions, and it has fully performed its own obligations under both contracts. Complaint ¶¶ 76–78, 82–84.

Century 21 has likewise sufficiently pleaded and proved its claim against Bernard. In signing the Personal Guarantee, Bernard agreed to take on personal liability for Bercosa's financial obligations. He guaranteed "the prompt payment and performance, when due of all obligations of the Franchisee under [the franchise agreements]" including all franchise royalties and fees, along with all other charges, fees and assessments provided for under the agreements. Personal Guarantee at 1. I therefore respectfully recommend that the court find both Bercosa and Bernard jointly and severally liable on Century 21's breach of contract claims. *See, e.g., Century 21 Real Estate LLC v. New Beginnings of North Shore Inc.*, 2009 WL 1689183, at *5 (E.D.N.Y. June 16, 2009) (recommending judgment jointly and severally against both defendants where franchisee had signed a personal guarantee for the financial obligations of the franchise).

### B. *Damages*

Notwithstanding the defendants' default, Century 21 must prove its damages to a "reasonable certainty." *Credit Lyonnais v. Alcantara*, 183 F.3d 151, 155 (2d Cir.1999) (quoting *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 111 (2d Cir.1997)). In support of its request for damages Century 21 has submitted, among other documents, the following: copies of both franchise agreements; the Personal Guarantee; letters sent to Bernard informing him of his violation of the agreements and the termination of the franchises and requesting that Bernard cease using Century 21's Marks in connection with his business, Complaint Exs. 5–7; the declaration of the person responsible for overseeing the invoicing and collection of fees from Century 21's franchisees, Bertet Dec. ¶¶ 1–2; copies of Century 21's trademarks, Bertet Dec. Ex. 4; and copies of financial records kept by Century 21 that demonstrate the amounts owed by Berco-

sa, Bertet Dec. Exs. 8, 9. Such detailed affidavits and other documentary evidence can suffice in lieu of an evidentiary hearing. *Finkel,* 577 F.3d at 83; *Action S.A. v. Marc Rich & Co., Inc.,* 951 F.2d 504, 508 (2d Cir.1991); *Credit Lyonnais,* 183 F.3d at 155.

For the reasons set forth below, I recommend that the court award a total of $315,107.61 in monetary damages on all claims. Because my analysis of the damages award on the Lanham Act claim depends to some extent on the results of my analysis of the damages available on the contract claims, I present the latter first before turning to the former.

### 1. *Contract Claims*

Century 21 seeks a total of $372,530.60 in damages on its contract claims. Specifically, it requests $68,162.34 in past due fee payments required under the terms of the franchise agreements; $11,529.82 in interest; and $292,838.44 in liquidated damages. Bertet Dec. ¶¶ 34–50. I address each component of its request in turn.

### a. *Past Due Payments*

The franchise agreements required Bercosa to make monthly payments to Century 21 based on its gross revenues from certain transactions: a "royalty fee" equal to six percent of the gross, and a contribution to Century 21's National Advertising Fund ("NAF") equal to two percent of the gross. However, the agreements also required that Bercosa's payments could not fall below a certain monthly minimum of $500 royalty fees and $562 for NAF contributions. *See* Complaint ¶¶ 21–22; Agreement ¶¶ 7.1.1, 7.1.4, 8.1, 8.2; Bertet Dec. ¶ 16. Century 21 had a right under the contract to raise the amount of each monthly minimum payment on an annual basis, *see* Agreement ¶ 12.1, but there is no evidence in the record that Century 21 ever exercised that right or the resulting amount of either minimum to the extent it did so.

Century 21 has calculated the unpaid amounts that Bercosa owed under the contractual provisions based on the transactions that Bercosa reported, the unreported transactions that Century 21 discovered as a result of its 2007 audit, and its application of the required monthly minimum payments for the period in which it has not conducted an audit. It has submitted the results of those calculations in the form of a "Custom Account Status Report" (the "Report") created on January 23, 2008. Bertet Dec. ¶ 34 & Ex. 8. In the Report, Century 21 concludes that Bercosa owes $24,830.25 for the Brooklyn location and $43,332.09 for the Queens location. Those totals include the following amounts:

| Item | Brooklyn | Queens |
| --- | --- | --- |
| Royalty fees (reported transactions) | $ 4,134.00 | none listed |
| Royalty fees (unreported transactions) | $ 1,465.50 | $21,682.44 |
| Royalty fees (monthly minimum) | $ 6,182.00 | $ 5,500.00 |
| NAF contributions (reported transactions) | none listed | none listed |
| NAF contributions (unreported transactions) | none listed | $ 1,687.80 |
| NAF contributions (monthly minimum) | $12,581.20 | $12,234.00 |
| Cost of audit | $ 300.00 | none listed |
| "Audit interest" | $ 167.01 | $ 2,227.85 |
| Total | $24,830.25 | $43,332.09 |

Bertet Dec. ¶¶ 34–36 & Ex. 8.

Certain aspects of the Report's calculations suggest that the court should not accept them at face value. For example, I do not understand why the reported transactions in the Brooklyn office sufficed to allow Century 21 to calculate the royalty fees that Bercosa owed under the contract but not the corresponding NAF payments. However, because Century 21 does not seek more than the minimum in NAF payments for that office, there is no reason to believe that any error in that regard will unfairly prejudice the defendants. Two other items are of more substantive concern.

First, to the extent Century 21 seeks to recover monthly minimum payments of

NAF contributions, it appears in certain months to have used minimum amounts higher than those set forth in the contract. While it is entirely possible that Century 21 exercised its contractual right to raise the minimum amounts to the levels reflected in its calculations, the record contains no evidence that it actually did so, or that in doing so it abided by the contractual restrictions on the amount of such increases. *See* Agreement ¶ 12.1.[3] As a result, to the extent that Century 21 appears to have calculated its damages on the basis of higher contractual minimum amounts than those recited in the contract, I have re-calculated the total based on the evidence in the record.[4]

Second, it appears that Century 21 may have double-counted some of its damages. For example, the Report includes minimum royalty fee amounts for April, September, and October of 2006, but also includes amounts for royalty fees for unreported transactions in each of those months. For the month of October 2006, the "functional amount" listed in the Report for unreported transactions is $348.50, with a balance due of $7.50—both amounts being less than the monthly minimum; for each of the months of April and September 2006, the amount sought for fees on unreported transactions ($780.00 and $678.00, respectively) exceeds the monthly minimum. Neither the Report, nor Bertet's declaration, nor Century 21's memorandum of law makes any attempt to explain whether Century 21 has taken any steps to avoid double-counting the fees due under the contract for those months. Absent any such explanation, I cannot conclude that Century 21 has established that the amounts corresponding to the unreported transactions are, in addition to the unpaid minimum fees, part of its contractual damages; I therefore conclude that for any month in which the Report includes both types of items, the court should exclude the lesser of the two amounts from its calculation of a damages award.[5]

3. To the extent that Century 21 might be able to cure the deficiencies in the record upon being told what they are, the court need not—and in my view should not—encourage piecemeal litigation by allowing it a further opportunity to develop the record. *See Finkel*, 577 F.3d at 86–87 (court considering default motion did not err in analyzing the record as presented by plaintiff rather than providing an opportunity to submit additional evidence where plaintiff never asked for a hearing, never sought to amend its complaint or supplement its allegations with evidence prior to default, and chose to rely on evidence submitted with its default motion).

4. Specifically, in my calculation of Century 21's contractual damages, I have reduced the minimum NAF contribution to $562.00 for each month in which the Report includes such an entry. This reduction obviates the need for the court to guess at the reason for the Report's reference to "minimum" NAF contributions for certain months that are inconsistent with the minimum amounts listed for other months. *See* Report at 2 (listing

Brooklyn office's minimum NAF contribution for August 2006 as $806.20); *id.* at 6 (listing Queens office's minimum NAF contribution for August 2007 as $1,100.00). Here again, there may well be facts that explain and justify the apparent anomaly, but Century 21 has not put them in the record.

5. As a result, I exclude $7.50 attributed to an unreported transaction in the Brooklyn office on October 2, 2006, as well as the minimum fees of $500 for each of April and September 2006. An overlap in the reporting of fees attributed to reported transactions in the Brooklyn office and the minimum fees charged for the months in which those transaction occurs leads me to exclude $318.00 attributed to a reported transaction on August 30, 2007, as well as the minimum fees of $500 for each of May, June, and August of 2006 and January of 2007. For similar reasons, I exclude from my calculation of damages for the Queens office the minimum royalty fees for September 2006 and January 2007 (in light of the Report's claims of greater amounts of fees attributed to unreported

I further disagree that the court should include the cost of the audit or the "audit interest" in its award. Century 21 claims that it is entitled to such recovery pursuant to a specific contractual term, Bertet Dec. ¶ 17 (Agreement ¶ 13.2), but the cited provision does not support that assertion. Rather, the contract addresses audit fees in a different provision, but conditions Century 21's right to assess such fees on the occurrence of certain facts that Century 21 has made no attempt to establish in this litigation. *See* Agreement ¶ 13.1 (providing for the recovery of audit fees if an audit reveals "a deficiency of at least 5% in amounts due under this agreement for any three-month period" or requires Century 21 to "spend more than the average amount of time or energy"). As far as I can discern, nothing in the contract provides for the recovery of "audit interest"— and if there is such a provision, Century 21 has failed to bring it to my attention. I therefore exclude the audit fee and the "audit interest" in calculating Century 21's contract damages.[6]

Taking into account all of the foregoing concerns, I have recalculated the amount of payments that Century 21 has established to a reasonable certainty that Bercosa owes under the franchise agreements:

| Item | Brooklyn | Queens |
|---|---|---|
| Royalty fees (reported transactions) | $ 3,816.00 | $ 0.00 |
| Royalty fees (unreported transactions) | $ 1,458.00 | $21,682.44 |
| Royalty fees (monthly minimum) | $ 3,182.00 | $ 4,500.00 |
| NAF contributions (reported transactions) | $ 0.00 | $ 0.00 |
| NAF contributions (unreported transactions) | $ 0.00 | $ 1,687.80 |
| NAF contributions (monthly minimum) | $11,802.00 | $10,653.00 |
| Cost of audit | $ 0.00 | $ 0.00 |
| "Audit interest" | $ 0.00 | $ 0.00 |
| Total | $20,258.00 | $38,523.24 |

As a result, I conclude that Century 21 has established that it is owed $20,258.00 for the Brooklyn office and $38,548.24 for the Queens office, for a total of $58,781.24 in past due contractual payments.

### b. *Interest*

The agreements entitle Century 21 to receive interest on the past due payments Bercosa owes at the highest rate permitted by law, up to a maximum annual interest rate of 18 percent. Agreement ¶ 11.2. Century 21 has requested interest on the outstanding payments due from the date of the termination of the agreements, October 30, 2007, to the date Century 21 filed its motion for a default judgment, November 18, 2008. This is a period of one year and 19 days. The maximum interest rate permitted under both New York and New Jersey law is 16% per annum. N.Y. General Obligations Law § 5–501; N.Y. Banking Law § 14–a; N.J.S.A. § 31:1–1(a). Applying an annual interest rate of 16

---

transactions in those months) as well as the minimum NAF contribution for March 2007 (in light of the Report's claim of a greater contribution attributed to unreported revenues in that month).

6. In excluding such damages, I assume that I may properly rely on the Custom Account Status Report as evidence, whether because Century 21 keeps such records in the ordinary course of its business, *see Century 21 Real Estate LLC v. Team Mates Realty Corp.*, 2009 WL 910655, at *6 (E.D.N.Y.2009), or because

it was prepared for purposes of this litigation by a person with access to the underlying data. My concern is not with the admissibility of such evidence, but rather its weight. I have no quarrel with the propositions that Century 21 has paid the audit fee it specifies and calculated "audit interest" according to some formula it believes to be appropriate. However, Century 21 has provided no evidence upon which I can rely to conclude either that there is a sufficient reason to award it the cost of the audit or that its interest calculation is correct.

percent to a corpus of $58,781.24 for a period of one year and 19 days produces a total interest amount of $9,894.57. I respectfully recommend that the court award that amount in interest.

### c. *Liquidated Damages*

In addition to actual damages and interest, the agreements require Bercosa, in the event of a breach, to pay Century 21 liquidated damages—or, to use the contract's terminology, "lost future profits." Agreement ¶ 16.7.2. The contract specifies that such an award is designed to reflect the profits Century 21 would have earned but for the franchisee's breach and provides a specific formula for estimating that loss:

> Lost future profits shall be equal to the combined monthly average of Royalty Fees, NAF contributions, and any other fees under this agreement ... payable from the Effective Date of this Agreement through the date of early termination, multiplied by the number of months (or partial months) remaining in the term of this Agreement. The present value of the total of these amounts calculated at a discount rate of 8% ... shall constitute [Century 21's] lost future profits.

*Id.*

Century 21 calculates its liquidated damages fees under this provision as $112,816.21 for the Brooklyn office and $180,022.23 for the Queens office as follows (using Century 21's figures but adapting the names of specific items for the sake of clarity):

| Item | Brooklyn | Queens |
|---|---|---|
| Royalty fees paid or due | $ 9,710.64 | $ 25,924.44 |
| NAF contributions paid or due | $ 17,649.20 | $ 17,734,00 |
| Total payments made or due | $ 27,359.84 | $ 43,658.44 |
| No. of months before termination | 21.90 | 21.90 |
| Avg. monthly payments made or due | $ 1,249.54 | $ 1,993.91 |
| No. of months remaining in term | 98.14 | 98.14 |
| Total "lost profits" | $122,636.31 | $195,676.34 |
| 8% discount | ($ 9810.10) | ($ 15,654.11) |
| Liquidated damages | $112,816.21 | $180,022.23 |

Motion Ex. 9. As explained below, I conclude that the record does not suffice to support all of this portion of Century 21's request.

The first component of the calculation requires Century 21 to establish, for each office at issue, the amount of payments that Bercosa made or should have made during the period when it was an authorized franchisee. That in turn requires Century to make two subsidiary showings: the amounts Bercosa actually paid during the life of the contract, and the amounts it should have made but did not. The latter should be equal to the unpaid amounts discussed above in part B.1.a of this discussion, and I rely on the same reasoning presented there to conclude that the portion of the liquidated damages calculation attributable to unpaid royalty fees and NAF contributions should be similarly reduced. Of greater concern is the portion of the liquidated damages calculation that Century 21 believes is attributable to the amounts Bercosa actually paid. I can infer what Century 21 believes those amounts to be (by subtracting the amounts it requested as outstanding contractual payments from the "paid or due" amounts set forth in the chart immediately above). But that inference is not sufficient: there is no evidence in the record that Bercosa actually made such payments. Here again, I acknowledge that it is entirely possible that Century 21 could have adduced evidence to support its calculation, but in the absence of such evidence the court should not deem such amounts to be established to a reasonable certainty. As a result, I conclude that in the first two lines of the chart used to calculate liquidated damages, Century 21's proposed amounts should be replaced by the smaller

amounts of outstanding contractual payments that I calculated earlier.[7]

The remaining components of Century 21's calculation appear to be correct, or nearly so. Because Bercosa was authorized to operate its franchises from January 2, 2006 until October 29, 2007, Century 21 properly divides the total amount of payments made or due by 21.90 months to calculate the monthly average. Given the ten-year term of the agreement, the number of months remaining in the contract after termination was 98.10—close to the number that Century 21 used in its calculations, but not identical, for reasons that I cannot divine from Century 21's submission. I therefore calculate the liquidated damages as follows:

| Item | Brooklyn | Queens |
|---|---|---|
| Royalty fees due | $ 8,456.00 | $ 25,924.44 |
| NAF contributions due | $11,802.00 | $ 12,340,80 |
| Total payments made or due | $20,258.00 | $ 38,265.24 |
| No. of months before termination | 21.90 | 21.90 |
| Avg. monthly payments due | $ 925.02 | $ 1,747.27 |
| No. of months remaining in term | 98.10 | 98.10 |
| Total "lost profits" | $90,744.46 | $171,407.18 |
| 8% discount | ($ 7,529.56) | ($ 13,712.57) |
| Liquidated damages | $83,214.90 | $157,694.61 |

As a result, I conclude that Century 21 has established that it is owed $83,214.90 in liquidated damages for the Brooklyn office and $157,694.61 for the Queens office, for a total of $240,909.51 in "lost future profits."

7. The Report calculates the total unpaid royalty fees in the Queens office to be $27,182.44—or $1,258.00 *more* than the amount of such fees Bertet used in calculating liquidated damages. Presumably, the amount used for the latter purpose—which includes fees that were paid in addition to those that were due—should be no less than the amount of outstanding payments. The discrepancy is yet another reason to hesitate in relying on Bertet's opaque calculations, or in assuming that they accurately reflect the underlying

### d. Total Damages for Contract Claims

For the reasons set forth above, I respectfully recommend that the court award Century 21 a total of $309,585.32 on its contract claims, consisting of $58,781.24 in outstanding contractual payments, $9,894.57 in contractual interest on such payments, and $240,909.51 in liquidated damages.

### 2. Lanham Act Claims

Century 21 seeks $100,000 in statutory damages for the defendants' unauthorized use of its marks.[8] The Lanham Act provides that a victim of a violation of either Section 1114 or Section 1125(a) may recover the damages sustained by the plaintiff, the costs of the action, and in certain circumstances, the defendant's profits. 15 U.S.C. § 1117(a); *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1540 (2d Cir.1992); *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 82 F.Supp.2d 136, 141 (S.D.N.Y.2000); *Cartier v. Aaron Faber, Inc.*, 512 F.Supp.2d 165, 172–73 (S.D.N.Y.2007). The Act also provides that, in a case such as this involving the use of a counterfeit mark in connection with the sale, offering for sale, or distribution of goods or services, the plaintiff may elect to recover—instead of actual damages and profits—an award of statutory damages for any such use. Statutory damages may be awarded in the amount of:

records that Century 21 has declined to submit. Because I cannot determine which of the two amounts is correct, I use the lower amount (*i.e.,* the same one that Bertet uses) to calculate liquidated damages.

8. Century 21 seeks only injunctive relief on its trademark dilution claim. Complaint ¶ 65; Memo. at 10–11. I therefore assess damages only as to the remaining two Lanham Act claims pursuant to which Century 21 seeks a monetary recovery.

(1) not less than $500 or more than $100,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just; or

(2) if the court finds that the use of the counterfeit mark was willful, not more than $1,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just.

15 U.S.C. § 1117(c) (2004) (amended 2008).[9]

■■■■■ Century 21 has elected to seek statutory rather than actual damages. Memo. at 12. It is entitled to do so notwithstanding the fact that the Lanham Act violations at issue involve the use of genuine rather than ersatz Century 21 Marks because the statute defines "counterfeit" to include "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127. The defendants' use of the genuine Century 21 Marks after their rights as franchisees expired (either by virtue of the termination or by the expiration of the contract term) was therefore, by statutory definition, the use of counterfeit marks to the extent they created the erroneous perception that Century 21 remained the source of the services provided. The defendants' default having made it impossible for Century 21 to determine the profits accrued by the defendants through the unauthorized use of Century 21's Marks, statutory damages are particularly appropriate here.

■■■ There is little doubt that the defendants' default was willful. The defendants ignored Century 21's repeated demands, prior to the filing of the Complaint, that they stop using the Century 21 Marks. See Complaint ¶¶ 38–41; Bertet Dec. ¶¶ 29–32 & Ex. F. The defendants continued to hold themselves out to the public, at least to some extent, as a Century 21 franchise at least through the date that the complaint was filed. Those facts suffice to establish the defendants' bad faith.[10] As a result, the court may award statutory damages anywhere in the range from $500 to $1,000,000 per counterfeit mark at issue in this case. 15 U.S.C. § 1117(c) (2004).

■■■ Choosing the most appropriate award within that very wide range pres-

9. As of October 13, 2008, the statute provides for damages of $1,000 to $200,000 per counterfeit mark per type of goods or services marketed or up to more than $2,000,000 apiece for a willful violation. 15 U.S.C. § 1117(c) (2008). Because the violations at issue here occurred before the amendment took effect, I assess statutory damages under the earlier version of the law. See Landgraf v. USI Film Products, 511 U.S. 244, 283–86, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994).

10. Arguably, Century 21 would not need to make any evidentiary showing to support its claim for damages, but could instead rely on the decisions that have held willfulness to be established by a defaulting defendant's failure to answer a complaint's allegation of willfulness. See, e.g., Century 21 Real Estate LLC v. Paramount Home Sales, Inc., 2007 WL 2403397, at *5 (E.D.N.Y. Aug. 20, 2007) (cit-

ing Malletier v. Whenu.Com, Inc., 2007 WL 257717, at *4 (S.D.N.Y. Jan. 26, 2007) (citing Rodgers v. Anderson, 2005 WL 950021, at *3 (S.D.N.Y. Apr. 26, 2005); Tiffany v. Luban, 282 F.Supp.2d 123, 124–25 (S.D.N.Y.2003))). Such reasoning appears to be in tension with the general rule that a default suffices to establish the allegations in a pleading that relate to liability but not those that relate to damages. As explained above, the defendants' liability here is established without regard to any allegation or showing of willfulness; the latter concept is relevant only to damages and should therefore not be susceptible to proof by means of default. Fortunately, the court need not resolve the legal question because the record includes evidence—beyond the Complaint's allegations and the default—that suffices to demonstrate willfulness. It is on that basis that I recommend the finding.

ents a more difficult question under the circumstances of this case. Indeed, Century 21 posits that "the issue of determining the precise amount of statutory damages that should be assessed against a counterfeiter, who is a former franchisee, appears to be one of first impression[.]" Memo. at 13. It then proceeds to advocate an award of $100,000 as the proper amount "both as compensation to Century 21 and to deter other potential infringers." *Id.* The only rationale Century 21 provides for its seemingly arbitrary suggestion is an assertion that $100,000 is "appropriate" in light of "the analogous case law in the Second Circuit cited herein[.]" *Id.* Century 21 does not specify which of the cases cited in its brief it intends to encompass in that vague reference, but as best I can tell, it intends to rely on three cased decided within this circuit that it cites as exemplary of the kinds of damages awarded under the Lanham Act. *See id.* (citing *Ermenegildo Zenga Corp. v. 56th St. Menswear, Inc.,* 2008 WL 4449533, *5 (S.D.N.Y. Oct. 2, 2008); *Pitbull Prod., Inc. v. Universal Netmedia, Inc.,* 2007 WL 3287368, *4 (S.D.N.Y. Nov. 7, 2007); *Kenneth J. Lane, Inc. v. Heavenly Apparel, Inc.,* 2006 WL 728407, *6 (S.D.N.Y. Mar. 21, 2006)). I disagree that those cases provide useful guidance here. In two of them, there was no similar relationship among the parties: as far as I can discern, the defendants in those each of those cases had not entered into a contractual relationship with the plaintiff and had never been authorized to use the plaintiffs' marks. *See Ermenegildo Zenga Corp.,* 2008 WL 4449533, at *1; *Pitbull Prod., Inc.,* 2007 WL 3287368, at *2. While there was a comparable prior relationship in the remaining case—the de-

fendant had obtained a license to sell the plaintiff's trademarked clothing and accessories, *Kenneth J. Lane, Inc.,* 2006 WL 728407, at *2—the court did not provide any explanation of why the award should be as high as the $125,000 per mark that it awarded. Instead, it merely rejected the plaintiff's request for a much higher award on the ground that the plaintiff had not provided any information that would justify such relief. *See id.* at *6. To the extent the court designed its award to for its deterrent effect, *see id.* ("an award of statutory damages of $125,000 per infringed mark will impress upon Heavenly that there are consequences for its misconduct"), I respectfully disagree that a similarly high award is required to achieve deterrence here for the reasons explained below. *See infra* at 294–95 & n. 14.

 More fundamentally, I disagree with Century 21's assertion that the circumstances here—a former franchisee found liable on Lanham Act claims as the result of a default that deprives the plaintiff of full information about the defendant's profits—present an issue of first impression. While there may be no decision that provides a rationale specifically for an award of *statutory* damages in similar circumstances, there is precedent for calculating an award of *actual* damages—and since statutory damages are intended to serve as a proxy for actual damages that the plaintiff would otherwise be unable to prove to a reasonable certainty,[11] that precedent, in turn, provides very useful guidance for determining an appropriate award within the statutory rate. As it happens, there are at least two cases that Century 21 itself litigated in this court in

---

11. "Congress added the statutory damages provision of the Lanham Act in 1995 because 'counterfeit[ers'] records are frequently non-existent, inadequate, or deceptively kept ... making proving actual damages in these cases extremely difficult if not impossible.'" *Moto-*

*rola, Inc. v. Abeckaser,* 2009 WL 962809, *8 (E.D.N.Y. Apr. 8, 2009) (quoting *Microsoft Corp. v. Computer Care Center, Inc.,* 2008 WL 4179653, *8 (E.D.N.Y. Sept. 10, 2008) (quoting, *inter alia,* S.Rep. No. 104–177, at 10 (1995))).

recent years that provide such useful precedent. *See Century 21 Real Estate, LLC v. Raritan Bay Realty, Ltd.,* 2008 WL 4190955 (E.D.N.Y. Sept. 3, 2008) (*"Raritan"*); *Century 21 Real Estate LLC v. Paramount Home Sales, Inc.,* 2007 WL 2403397 (E.D.N.Y. Aug. 20, 2007) (*"Paramount"*).

In both *Raritan* and *Paramount,* as in this case, the defendants—corporate real estate brokers along with the individual owners who personally guaranteed their respective companies' contractual performance—entered into ten-year franchise agreements with Century 21. In each case, as a result of the franchisee's failure to pay royalty fees and NAF contributions, Century 21 exercised its right to terminate the contract and demanded that the defendants discontinue their previously authorized use of the Century 21 Marks. The defendants neither complied nor responded to Century 21's civil complaint in this court. As a result, Century 21 established default liability on its Lanham Act and contract claims. *Raritan,* 2008 WL 4190955 at *1–*2, *4–*6, *12–13; Paramount,* 2007 WL 2403397, at *2–*4. In each case, the court awarded actual damages far lower than the amount Century 21 now claims to be "appropriate" as an award of statutory damages—and also, in each case, awarded much lower amounts of contractual damages.

In *Raritan,* Century 21 requested a monetary damages award consisting of thrice the total of its losses and the defendants' profits; Century 21 did not specify the amount of its losses and asked for an opportunity to establish the defendants' profits after a court-ordered audit of the defendants records. The court granted the profits-based component of the request for Lanham Act damages, but declined to award any compensatory damages because Century 21 had done nothing to prove any actual losses to a reasonable certainty.

2008 WL 4190955 at *6–*8. On the contract claims, Century ·21—relying on essentially the same formulas used here, albeit without submitting the corresponding detailed report of outstanding payments due—requested $23,209, but the court awarded only nominal damages because Century 21 had not provided sufficient documentation of its losses. *Id.* at *14–*15. In the wake of that decision, Century 21 either never conducted the audit or, having done so, found no evidence of further losses: on June 2, 2009, it reported that the defendants had fully satisfied the judgment without ever making the request for supplemental damages that the judgment permitted. Docket no. 07–CV–1455 (CPS)(JO), DE 40 (notice of satisfaction of judgment).

In *Paramount,* Century 21 argued that although it could not prove its actual damages with any precision due to the lack of information resulting from the defendants' default, the court should estimate its actual losses for purposes of the Lanham Act pursuant to a formula that would estimate its lost profits. Specifically, it proposed that the court "calculat[e] the average membership fees paid . . . under the Franchise Agreement for the eighty-two months prior to the termination" and multiply that amount "by [the number of months in] the infringement period in order to calculate plaintiff's estimated lost profits." 2007 WL 2403397, at *4; *see also id.* at *2 (defining "membership fees" to mean the sum of royalty fees and NAF contributions, calculated according to the same formulas as apply in this case). The court concluded that although such a method for calculating actual damages was "speculative," it was nevertheless "reasonable and appropriate." *Id.* at *4. Moreover, in ·a passage of particular relevance here, the court noted that precisely the same methodology could be used to assess *statutory* damages—the very matter as to

which Century 21 now says there exists no precedent. *Id.* After applying the proposed formula for determining lost profits and agreeing that the defendants' willfulness justified a trebling of that amount, the court awarded a total of $31,285.71 in damages on the Lanham Act claims. *Id.* at *5. The court then went on to determine the amount of "lost future profits" for purposes of assessing damages under the contract claims. Applying the same formula used here to calculate such damages, the court awarded an additional $39,688.36 in contractual damages.

The lesson I draw from such precedent is two-fold. First, it is clear that there is no reason to resort to the kind of arbitrary selection of a damages amount that Century 21 proposes on the ground that it knows of no applicable precedent.[12] Instead, the court can easily adopt one of at least two methods for crafting relief that Century 21 has previously endorsed as an appropriate way to remedy the harm it suffers when a franchisee continues to use its marks after losing authority to do so: it can adopt the *Raritan* model, which allows Century 21 to gather information currently unavailable and then seek a supplemental award; or it can adopt the *Paramount* model, which allows Century 21 immediately to obtain judgment in an amount certain that ade-

quately measures its damages.[13] In light of the precedent discussed above—the existence of which Century 21 does not even acknowledge—there is not even a need to resort to statutory damages at all: Century 21 could obtain appropriate relief by seeking its actual damages. While it has no obligation to do so—the statute explicitly affords a plaintiff the right to "elect" its avenue of seeking relief, 15 U.S.C. § 1117(c)—neither does it have the right to secure a windfall by virtue of its lawful choice of statutory damages.

Second, it is also clear that the recommendation I have already made as to an award of damages on the contract claims in this case will suffice to remedy *all* of the harm that Century 21 has suffered as a result of the defendants' Lanham Act violations. At Century 21's request, I have recommended that the court award three categories of contractual damages: the first—past-due payments—represents the same damages that the court in *Paramount* awarded as an estimation of lost profits arising from the Lanham Act violations in that case, albeit before trebling; the second—interest on past-due payments—is a remedy that has no corollary in *Paramount;* and the third—liquidated damages characterized as "lost future

---

**12.** It is equally clear that Century 21 knew of this precedent when it described the issue now before the court as a matter of "first impression" and failed to cite the cases it had recently litigated. Not only was Century 21 the plaintiff in those recent cases, but its current counsel represented Century 21 when it reviewed the report and recommendation in *Raritan*—which cited *Paramount, see* 2008 WL 4190955 at *7 n. 3, *11—and decided not to object to it.

**13.** The franchise agreements themselves appear to provide yet another method for crafting appropriate relief. Indeed, the contracts explicitly purport to monetize the harm that Century 21 would suffer from the precise kind of Lanham Act violations at issue here:

"If you continue to use the Marks after the expiration or termination of this Agreement, you will be deemed to be operating on a month-to-month basis under the terms and conditions of the then-current franchise agreement being offered to prospective franchisees, except that the Royalty Fee payable shall be 15% of Gross Revenue." Agreement ¶ 16.1.2. Even without judicial precedent, Century 21 could easily have brought this provision of its agreements to the court's attention as a potential measure of an appropriate award of statutory damages. In light of the fact that Century 21 has neither done that nor sought to invoke the quoted provision in seeking its contract damages, I give it no further consideration.

profits"—corresponds to the *sole* type of damages that the *Paramount* court awarded on the contract claims.

Moreover, the admittedly sparse record suggests that those contractual damages greatly overstate any harm that Century 21 will actually suffer as a result of Bercosa's actions. The number of months for which Century 21 is seeking to recover the contractually-defined minimum payments rather than the amounts based on Bercosa's actual revenues—even after taking into account the small number of unreported transactions revealed in the audit of early 2007—strongly suggests that Bercosa would never have been in a position to pay Century 21 the fees it will now recover by virtue of the breach. In addition, Century 21 reaps a further windfall by collecting interest on past-due payments at an annual rate of 16 percent—a rate far in excess of any return Century 21 could reasonably have expected to enjoy by investing the payments if they had been made on time. Thus, to the extent that an award under the Lanham Act is designed to remedy Century 21's lost profits, past or future, there is no reason to do anything than award the statutory minimum amount.

I recognize of course that a counterfeiter's Lanham Act violation can do more than just deprive a plaintiff of the profits of sales directly lost to the counterfeiter. Profits can also be lost indirectly as a result of the harm that the plaintiff's reputation may suffer when a counterfeiter misleads consumers into believing that the counterfeiter's own goods or services are attributable to the plaintiff. But the risk of such harm is plainly lessened where the violation at issue is a former franchisee's continued use of a trademark after the authorization for such use has ended as the result of a contract dispute. Century 21 was plainly content to have Bercosa use its marks during the term of the franchise agreements, without any concern that the quality of Bercosa's service would harm the franchisor's reputation. Absent some reason to think that Bercosa's service has become poorer since Century 21 exercised its right to terminate the franchise—and the record reveals none—there is no reason to award more than the statutory minimum to compensate Century 21 for any speculative harm to its reputation. Moreover, as discussed below, any potential future harm to Century 21's reputation can best be redressed through injunctive relief, which I recommend the court award.

Where a defendant's Lanham Act violation is willful, as I conclude the record reflects here, the court need not limit its award to compensation for the plaintiff's loss; it may also consider the need to deter future violations. *See, e.g., George Basch,* 968 F.2d at 1537; *Gidatex,* 82 F.Supp.2d at 141. Here again, the circumstances of this case are important: if Bercosa had paid the royalty fees and NAF contributions required under the franchise agreement, its continued use of the Century 21 Marks would be perfectly acceptable; it is only because Bercosa failed to honor its contractual obligation to make such payments that Century 21 withdrew the authorization for the use of its marks. The apparently ruinous contract damages that Century 21 is entitled to collect under its contract will likely deter similar contract violations—and the contract appears to be designed to achieve precisely that goal. If the contract's damages provisions are effective in deterring contract violations, they will necessarily also forestall the kind of Lanham Act violation at issue here. To the extent that any additional deterrence is needed to deter the contract-violating ex-franchisee from continuing to use a trademark after it has lost the authorization to do so, an award designed to achieve such deterrence

should be calibrated to reflect its incremental nature.[14] In the absence of any specific guidance on that score, I respectfully recommend that the court multiply the minimum amount of damages under the Lanham Act by ten, and award a total of $5,000 on the Lanham Act claims.[15]

## C. Injunctive Relief

■ Century 21 asks the court to issue a permanent injunction barring the defendants or any surrogates from using the Century 21 Marks to market or promote their real estate brokerage services. The Lanham Act provides for such relief, "according to the principles of equity and upon such terms as the court may deem reasonable to prevent the violation of ... [the Act.]" 15 U.S.C. § 1116. An injunction is warranted where a party has succeeded on the merits, there is an absence of an adequate remedy at law, and an injunction is necessary to prevent irrepa-

rable harm. *Roach v. Morse,* 440 F.3d 53, 56 (2d Cir.2006). Accordingly, Century 21—having succeeded on the merits of its Lanham Act claims—is entitled to an injunction if it demonstrates that such relief is necessary to avoid irreparable harm and that it has no adequate remedy at law. I conclude that Century 21 has made that showing.

■ Irreparable injury in trademark cases is established where "there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source" of the goods or services in question. *Lobo Enters., Inc. v. Tunnel, Inc.,* 822 F.2d 331, 333 (2d Cir.1987) (internal quotation marks and citations omitted); *see also Burndy Corp. v. Teledyne Indus., Inc.,* 748 F.2d 767, 772 (2d Cir.1984) ("permanent injunctive relief will be granted only upon proof of the likelihood that purchasers of the product may be misled in

14. It is in this respect that I respectfully conclude that the decision in *Kenneth J. Lane, Inc.* is of limited value in guiding the court here. While it is true that the latter decision also provided for a large award of contract damages for reasons similar to those supporting a corresponding award here, 2006 WL 728407, at *3, the court did not explicitly discuss the extent to which (if any) the deterrence inherent in the contract damages award might also suffice to deter the kind of Lanham Act violation that occurred in that case. *See id.* at *6.

15. I recognize that the statutory damages provision sets a minimum award of $500 "per counterfeit mark per type of goods or services sold, offered for sale, or distributed[.]" 15 U.S.C. § 1117(c) (2004). I also recognize that Century 21's papers refers to the Century 21 Marks in the plural—suggesting that if the court were to award the bare minimum in damages it would have to determine precisely how many counterfeit marks Bercosa used (I assume Century 21 would agree that there was only one "type of goods or services" at issue, namely, real estate brokerage). In recommending an award of $5,000, I explicitly

predicate my analysis—*i.e.,* that nothing beyond the minimum is needed for compensation, and that a ten-fold increase will suffice for deterrence under the circumstances—on an assumption that Bercosa used only one counterfeit mark. As far as I can determine, the record offers no support for its unauthorized use of any mark other than the use of the name "Century 21" as part of the company name ("Century 21 Bercosa Realty") that Bercosa continued to display on its storefront sign and in its internet advertisements following the termination of the franchise agreements. *See* Bertet Dec. ¶ 30 & Exs. 5–6. At a more fundamental level, even if the record could be interpreted as showing Bercosa's use of multiple marks it would nevertheless reveal only one type of misconduct that should be deterred: Bercosa's attempt to pass itself off as a Century 21 franchisee when it was no longer authorized to do so. Under the circumstances of this case, I conclude that an award of $5,000 suffices for deterrence purposes, and would recommend an award in that amount regardless of the precise number of marks at issue (provided the number was no more than ten, to avoid running afoul of the statutory minimum).

the future"); *Collins v. Aztar Corp.*, 210 F.3d 354, 354 (2d Cir.2000); *cf. SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1100 (2d Cir.1972) (injunction unnecessary if there is no reasonable likelihood that the conduct at issue will be repeated). The record establishes that, absent an injunction, the defendants will continue to infringe the Century 21 Marks, and that such use is likely to mislead consumers as to the source of Bercosa's real estate brokerage services. The defendants failed to respond to any of Century 21's letters demanding that they stop using the Century 21 Marks, Complaint ¶ 41, and they continued to use the Century 21 Marks even up to the commencement of this litigation. Because the defendants are using Century 21's actual marks, an ordinary prudent purchaser is likely to be unaware that Century 21 is not the source of Bercosa's services.

Century 21 has also established that it has no adequate remedy at law. Such a remedy exists if an injured party can be compensated by a monetary damages award. *Borey v. Nat'l Union Fire Ins. Co.*, 934 F.2d 30, 34 (2d Cir.1991). However, in cases where confusion about the origin of goods or services leads to damage to reputation or loss of a potential relationship with a client that "would produce an indeterminate amount of business in years to come[,]" monetary damages are difficult to establish and are unlikely to present an adequate remedy at law. *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir.2004) (citing *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999)). If the defendants are allowed to continue to use the Century 21 Marks they may adversely affect Century 21's reputation and business in ways that may be difficult to quantify and that will not lend themselves easily to monetary compensation.

In the alternative, Century 21 is also entitled to injunctive relief based on the defendants' violation of 15 U.S.C. § 1125(c), Century 21's trademark dilution claim. Century 21 has alleged that the defendants have diluted its trademark by undermining the distinctive quality of Century 21's Marks. *See* Complaint ¶¶ 59–66. Under Section 1125(c), the owner of a distinctive famous mark is entitled, subject to the principles of equity, to an injunction against anyone who uses the mark in a way that is likely to cause "dilution by blurring" of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury. 15 U.S.C. § 1125(c)(1). Whether a mark or trade name is likely to cause dilution by blurring depends on factors including the similarity between the mark and the famous mark, the distinctiveness and degree of recognition of the famous mark, and whether the user of the mark or trade name intended to create an association with the famous mark. *Id.* § 1125(c)(2)(B). The record here plainly shows that the defendants' continued unauthorized use of the actual Century 21 Marks creates a risk of such dilution by blurring. I therefore respectfully recommend that the court permanently enjoin the defendants from using the Century 21 Marks to market or promote their real estate brokerage services, and from otherwise holding themselves out as a Century 21 franchise.[16]

### D. *Audit*

Century 21 has requested an audit of Bercosa's books and records in order to

---

**16.** Century 21 also seeks the reimbursement of its costs, including reasonable attorneys' fees, on its Lanham Act claims. Because it also seeks similar relief on its contract claims, I address the issue in a separate section after addressing liability and damages issues on the contract claims.

verify the gross revenues of the two offices, "including, but not limited to sales which post-dated the termination of the franchises that were made utilizing Century 21's trademarks" so that it may determine "any and all profits derived as a result of marketing or promoting [Bercosa's] real estate brokerage business through and with Century 21's trademarks after the termination of the Franchise Agreements." Complaint ¶¶ 90–93; Memo. at 18.

Under the franchise agreements, Century 21 is entitled to an audit, but only for the period between March 1, 2007 (the date through which Bercosa was last audited by Century 21 under the franchise agreements, *see* Brief at 18) to October 29, 2007 (the last day the franchises were in operation). The agreements provide that Century 21 can perform an audit of the business "during the term of [the] Agreement and for [sic] period of three years following any termination[.]" Agreement ¶¶ 13.2; 16.9. The plain meaning of this provision, however, is that Century 21 may perform the audit within three years, not that Century 21 may access the former franchisee's records for business conducted after it ceased its association with Century 21. Century 21 has not called my attention to any provision of the agreements allowing Century 21 access to records of sales made after the franchise was terminated.

■ Under the Lanham Act, Century 21 is entitled to an audit for the period following the termination of the franchise based on the Act's "invocation of equitable principles." *George Basch*, 968 F.2d at 1537. Because the defendants' default has deprived Century 21 of the opportunity to prove its damages, it is entitled to an audit. See *Raritan*, 2008 WL 4190955 at *8 (permitting Century 21 to audit the books of a former franchisee to determine extent to which the defendants profited by

using the Century 21 Marks after termination of their franchise). Given the extensive contractual damages to which Century 21 is entitled, it seems highly unlikely that the audit it seeks will reveal that the damages I recommend here are too low—if anything, it seems likely that such an audit may support the view that the liquidated damages provision Century 21 seeks to enforce is unduly punitive. But Century 21 should be given the opportunity it seeks to secure information of which it has been deprived as a result of Bercosa's default. To the extent that such an audit shows that Century 21 lost more revenue than the court awards as damages on the contract claims, Century 21 should be entitled to request an appropriate supplemental award. I therefore respectfully recommend that the court order the defendants to cooperate in an audit of Bercosa's books and records and, within 30 days of completion of the audit, permit Century 21 to petition the court to amend its judgment to reflect any additional damages to which it may at that point be entitled.

### E. *Attorneys' Fees*

■ Century 21 seeks a total of $8,197.36 in attorneys' fees and costs under the terms of the contract, Bertet Dec. ¶ 58; Complaint ¶¶ 79, 85; Memo. at 15–17, and under the Lanham Act. Complaint ¶¶ 54, 58, 66. Where attorney's fees are provided for in a contract, "the court must order the losing party to pay the amount actually incurred by the prevailing party, 'so long as those amounts are not unreasonable.'" *Century 21 v. New Beginnings of North Shore Inc.*, 2009 WL 1689183, at *4 (internal citation omitted); *see also F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1263 (2d Cir. 1987). Additionally, where a plaintiff establishes a defendant's willful violation of the Lanham Act, the court must award such fees in the absence of "extenuating

circumstances[.]" 15 U.S.C. § 1117(b). I therefore recommend that the court award Century 21 its reasonable attorneys' fees.

■■■ Courts in this circuit assess attorneys' fee applications using the "lodestar method," under which a reasonable hourly rate is multiplied by a reasonable number of hours expended. *See Luciano v. Olsten Corp.*, 109 F.3d 111, 115 (2d Cir.1997); *King v. JCS Enterprises, Inc.*, 325 F.Supp.2d 162, 166 (E.D.N.Y.2004) (citing *Green v. Torres*, 361 F.3d 96, 98 (2d Cir. 2004); *Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir.1999)). The lodestar method, however, does not simply rely on any mechanical invocation of an attorney's claimed hours and rates. Rather, a court considering a fee application must determine "what a reasonable, paying client would be willing to pay" in light of all the relevant circumstances of the case. *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182, 184 (2d Cir.2008).[17]

■■■ District courts have broad discretion, using "their experience with the case, as well as their experience with the practice of law, to assess the reasonableness" of each component of a fee award. *Fox Indus., Inc. v. Gurovich*, 2005 WL 2305002, at *2 (E.D.N.Y. Sept. 21, 2005) (quoting *Clarke v. Frank*, 960 F.2d 1146, 1153 (2d Cir.1992)). I therefore proceed to examine the reasonableness of both the hourly rates at which Century 21's attorneys seek to be compensated and the number of hours for which they seek reimbursement. As explained below, I conclude that the court should reduce some of the claimed hourly rates in calculating the fees for which Century 21 should be reimbursed.

### 1. *Hourly Rates*

Century 21 asks for an award of fees based on the following hourly rates that the law firm representing it seeks to charge them for professional services.

| Name | Position | Requested Hourly Rate |
| --- | --- | --- |
| Ronald A. Giller | Partner | $320 |
| Matthew Koster | Associate | $230 |
| Joshua Hurwit | Law Clerk | $140 |
| Stacey M. Francis | Paralegal | $140 |

Motion Ex. 2 (declaration of Ronald A. Giller, a partner at Gordon & Rees, the law firm representing Century 21) ("Giller Dec.") ¶¶ 9–13. Mr. Giller is a partner at Gordon & Rees LLP with eleven years experience in the practice of law. Mr. Koster is an associate with two years experience. Mr. Hurwit is a first-year associate who has not yet been admitted to the bar and who is therefore billed as a law clerk. *Id.*

■■■ A court seeking to determine the rate a reasonable client would be willing to pay should consider, among others, the twelve so-called *Johnson* factors: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal services properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the "undesireability" of the case; (11) the nature and length of the professional relationship with the client;

---

17. In using the "lodestar" terminology, I recognize that its meaning "has shifted over time, and its value as a metaphor has deteriorated to the point of unhelpfulness." *Id.* at

190. I use the term here only for ease of reference, and without the artificial limitations that the court rejected in *Arbor Hill. See id.* at 190 n. 4.

and (12) awards in similar cases. *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974). In doing so, the court should "bear in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively." *Arbor Hill*, 522 F.3d at 190. Having considered all of the circumstances in that light, I am persuaded that a reasonable, paying client would be willing·to pay the hourly rates claimed for the admitted attorneys, but would not be willing to pay the claimed hourly rates for the other professionals. *See King v. STL Consulting, LLC*, 2006 WL 3335115, at *7 (E.D.N.Y. Oct. 3, 2006) (collecting cases and finding that in this district, hourly rates range from $200 to $375 for partners, $200 to $250 for senior associates, and $100 to $150 for junior associates, and finding $70 to be the customary hourly rate for paralegals). *Lynch v. Town of Southampton*, 492 F.Supp.2d 197, 212 (E.D.N.Y.2007) ($100 per hour reasonable for attorney awaiting admission, $75 per hour for paralegal); *La Barbera v. Bulldog Constr., Ltd.*, 98–CV–7286 (JS) (MLO), 2005 U.S. Dist. LEXIS 32632, at *15 (E.D.N.Y. July 28, 2005) (finding $85 per hour for student law clerks to be reasonable); *Cho v. Koam Medical Services P.C.*, 524 F.Supp.2d 202, 208 (E.D.N.Y.2007) ($75 for paralegal reasonable). I therefore recommend that the court reimburse Century 21 for its attorneys' fees at the following hourly rates:

| Name | Position | Requested Rate | Recommended Rate |
|---|---|---|---|
| Ronald A. Giller | Partner | $320 | $320 |
| Matthew Koster | Associate | $230 | $230 |
| Joshua Hurwit | Law Clerk | $140 | $100 |
| Stacey M. Francis | Paralegal | $140 | $ 75 |

## 2. *Hours Expended*

 A fee applicant bears the burden of demonstrating the hours expended and the nature of the work performed, preferably through contemporaneous time records that describe with specificity the nature of the work done, the hours expended, and the dates. *New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1147–48 (2d Cir.1983). In lieu of contemporaneous time records, an applicant may submit "summaries ... accompanied by affidavits stating that the summaries are accurate and based on contemporaneous records." *Pressman v. Estate of Steinvorth*, 886 F.Supp. 365, 367 (S.D.N.Y.1995) (citing *Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1160 (2d Cir.1994)). Inadequate documentation is grounds for reduction of a fee award. *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Levy v. Powell*, 2005 WL 1719972, at *6 (E.D.N.Y. Jul. 22, 2005). Century 21 has submitted the declaration of Ronald A. Giller, a partner at Gordon & Rees, the law firm representing the plaintiff, along with supporting billing records that appear to have been contemporaneously made. *See* Giller Dec. Ex. A.

Century 21 seeks reimbursement for a total of 17.3 hours of time expended by its attorneys and other members of their office. *See* Giller Dec. ¶ 14. Having reviewed Century 21's submission in this regard I am satisfied that it sufficiently documents the number of hours its attorneys have billed, and that the number of hours requested is reasonable. Applying the hourly rates I recommend to the number of hours reasonably expended produces the following result:

| Name | Recommended Rate | Hours | Fee |
|---|---|---|---|
| Ronald A. Giller | $320 | 11.0 | $3,520.00 |
| Matthew Koster | $230 | 3.4 | $ 782.00 |
| Joshua Hurwit | $100 | 2.5 | $ 250.00 |
| Stacey M. Francis | $ 75 | 0.4 | $ 30.00 |
| Total | | 17.3 | $4,582.00 |

I accordingly recommend that the court award Century 21 $4,582.00 in attorneys' fees.

### F. *Other Litigation Costs*

■ Finally, Century 21 seeks an additional $854.36 in litigation costs, consisting of $350.00 in filing fees, $189.36 in legal research fees paid to Westlaw, and $315.00 in process server fees. Giller Dec. ¶ 15. The process server fee is adequately described and documented and the $350 filing fee is conclusively established by the docket, *See Century 21 Real Estate LLC v. Bercosa Corp., et al.,* docket no. 08–CV–3175 (JG)(JO), DE 1 (E.D.N.Y. Aug. 5, 2008); those costs should be awarded. On the other hand, Century 21 has not adequately documented its legal research costs; in particular, it has failed to provide any documentation from Westlaw. For that reason, I respectfully recommend that the court award Century 21 $665.00 in litigation costs.

### III. *Recommendation*

For the reasons set forth above, I respectfully recommend that the court enter a default judgment in favor of plaintiff Century 21 Real Estate LLC and award it a total of $319,832.32 jointly and severally against defendants Bercosa Corp. and Pedro Bernard, consisting of $309,585.32 for the defendants' contract claims (including $58,781.24 in outstanding contractual payments, $9,894.57 in contractual interest on such payments, and $240,909.51 in liquidated damages), $5,000.00 in statutory damages under the Lanham Act, $4,582.00 in attorneys' fees, and $665.00 in other costs. I further recommend that the court order the defendants to cooperate in an audit of defendant Bercosa's books and records, and that it permanently enjoin both defendants from using the Century 21 Marks to market or promote their real estate brokerage services and from otherwise holding themselves out as a Century 21 franchise.

### IV. *Objections*

I direct the plaintiff to serve a copy of this Report and Recommendation on each defendant by certified mail, and to file proof of service with the court no later than August 28, 2009. Any objections to this Report and Recommendation must be filed with the Clerk no later than September 14, 2009. Failure to file objections within this period waives the right to appeal the District Court's order. *See* 28 U.S.C. § 636(b)(1); *See* Fed.R.Civ.P. 72(b)(2); *Beverly v. Walker,* 118 F.3d 900 (2d Cir.1997); *Savoie v. Merchants Bank,* 84 F.3d 52 (2d Cir.1996).

**SO ORDERED.**

Dated: Brooklyn, New York.

August 25, 2009.